**In re T.H.B. CORPORATION, Debtor.**

**Bankruptcy No. 88–40034–JFQ.**

United States Bankruptcy Court,
D. Massachusetts.

April 21, 1988.

Steven Kressler, Kressler, Kressler & Pitnof, Worcester, Mass., for debtor.

Jay Theise, Widett, Slater & Goldman, Worcester, Mass., for Bank of New England/Worcester.

Leonard Krulewich, Silverman & Kudisch, Boston, Mass., for F.W. Webb.

## FINDINGS OF FACT AND RULINGS OF LAW

JAMES F. QUEENAN, Jr., Bankruptcy Judge.

T.H.B. Corporation (the "Debtor") moves that the Court enter a final order authorizing the use of cash collateral consisting of the proceeds of accounts receivable, pursuant to 11 U.S.C. § 363(c)(2) and Bankr.R. 4001(b)(2). The Court on January 28, 1988 authorized the use of cash collateral on an interim basis and granted post-petition liens in the accounts and inventory of the Debtor to the first secured creditor, Bank of New England/Worcester (the "Bank"), and the second secured creditor, F.W. Webb Company ("Webb"). The priority granted in the post-petition liens corresponded to both creditors' pre-petition priority. The Bank opposes the present motion, contending that its first security interests do not give it adequate protection. Webb also opposes the motion, but only if it is denied the right to receive interest payments on its debt. We grant the Debtor the right to use cash collateral; the Bank has adequate protection in the form of security interests in the Debtor's property and mortgages securing the personal guaranty of the Debtor's principal, as well as in the fact that the proceeds of accounts receivable are being used by the Debtor to generate new inventory and accounts. We deny Webb interest payments on its debt because Webb has no right under the doctrine of marshalling to require the Bank to first seek satisfaction under the personal guaranty. Because Webb has no right to require marshalling, its second security interests are of no value under an orderly liquidation standard of valuation which the Court rules is the proper standard of valuation.

## I. FACTS

The Debtor is a plumbing contractor which performs much of its work under subcontracts. Its accounts receivable are often subject to "retainages," amounts the general contractor withholds from the Debtor until the Debtor completes certain stages of work. The Debtor's financial difficulties apparently stem from two causes: accounting deficiencies which caused it to underestimate its costs on jobs; and its entry into the ventilation and air conditioning business, a field in which it had little experience. Since the Chapter 11 filing, the Debtor has hired a financial consultant who has instituted a better accounting system, enabling the Debtor to make more realistic and profitable bids on construction jobs. The Debtor has also discontinued its ventilation and air-conditioning division, and has significantly cut down its labor force. The Debtor is now at least at a break-even point.

The Bank has a first lien on all the Debtor's assets. It also has guaranties from the Debtor's principal and majority shareholder, Theodore Bosse ("Bosse"), which are secured by first mortgages on Bosse's residence and land and building owned by Bosse and leased to the Debtor. The Debtor owes the Bank approximately $800,000.

Webb is the Debtor's major supplier of plumbing inventory. To secure a debt of approximately $340,000, Webb has taken a second position in the Debtor's accounts receivable, inventory, and equipment. Webb's debt is represented by a promissory note for $182,000 and the remainder by open account debt. For the purpose of this motion, we assume, without ruling, that both the Bank and Webb have valid, perfected security interests in the Debtor's assets.

The Court finds, based upon the testimony of the Debtor's financial consultant, which was the only evidence of value, that the Debtor's assets have the following going concern values and orderly liquidation values:

|  | Going Concern Value | Liquidation Value |
|---|---|---|
| Accounts Receivable | $ 600,000.00 | $270,000.00 |
| Inventory | 145,000.00 | 36,250.00 |
| Machinery & Equipment | 18,575.00 | 18,575.00 |
| Furniture & Fixtures | 84,600.00 | 21,150.00 |
| Vehicles | 116,500.00 | 58,250.00 |
| Cash & Deposits | 48,000.00 | 48,000.00 |
| Leasehold Improvements | 51,350.00 | 25,675.00 |
| Totals | $1,064,025.00 | $477,900.00 |

The Court also finds, based in part upon testimony and in part upon stipulations, that the real estate owned by Bosse securing his personal guaranty has a total fair market value of $819,000.

## II. BANK'S ADEQUATE PROTECTION

■ We conclude that the Bank's first security interests in the Debtor's assets and its mortgages on Bosse's real estate give the Bank the adequate protection required by 11 U.S.C. § 363(e), under any theory of the meaning of adequate protection. The Bankruptcy Code only gives examples of adequate protection rather than an all-encompassing definition. *See* 11 U.S. C. § 361. Some courts have developed the theory that a sufficient "cushion" of collateral value in excess of the debt can constitute adequate protection by itself. *See, e.g., Heritage Savings & Loan Association v. Rogers Development Corp. (In re Rogers Development Corp.),* 2 B.R. 679 (Bankr.E.D.Va.1980). Under this approach, the Bank is adequately protected; its collateral values including the mortgages securing Bosse's guaranty total $1,296,900 even at liquidation values. This is far in excess of its $800,000 debt.

■ In so valuing the Bank's security interest, it is certainly proper to include the value of its mortgages securing Bosse's guaranty. The legislative history to § 361, in discussing the various forms adequate protection may take, expressly mentions guaranties by third parties as a means of adequately protecting a secured party's interest. H.R.Rep. No. 595, 95th Cong., 1st Sess. 340 (1977), U.S.Code Cong. & Admin. News 1978, p. 5787. Although some courts have held that third party guaranties cannot serve as adequate protection, these cases involved either an unsecured guaranty or a guaranty secured by collateral of negligible worth. *See In re Thomas Parker Enterprises, Inc.,* 8 B.R. 207 (Bank.D. Conn.1981) (collateral of "doubtful value"); *In re Kenny Kar Leasing, Inc.,* 5 B.R. 304 (Bankr.C.D.Cal.1980) (unsecured guaranty). In those cases, the courts reasoned that the guaranty only gave the creditor an uncertain right to bring a legal action against a third party who might be able to dissipate his assets before the creditor secured a judgment. Here, however, the guaranty is secured by mortgages on two pieces of real property with substantial value. In these circumstances, courts have been willing to hold that a guaranty may serve as adequate protection. *In re Greenwood Building Supply, Inc.,* 23 B.R. 720 (Bankr.W.D. Mo.1982); *Sun Bank/Suncoast v. Earth Lite, Inc. (In re Earth Lite, Inc.),* 9 B.R. 440 (Bankr.M.D.Fla.1981); *accord Hamilton Bank v. Diaconx Corp. (In re Diaconx Corp.),* 69 B.R. 333, 338–39 (Bankr.E.D.Pa. 1987) (recognizing that a guaranty can serve as adequate protection).

Under another theory of adequate protection, the concept consists of stability in collateral value rather than any particular level of value. *See Bankers Life Insurance Co. v. Alyucan Interstate Corp. (In re Alyucan Interstate Corp.),* 12 B.R. 803 (Bankr.D.Utah 1981); *see also United Savings Association of Texas v. Timbers of Inwood Forest Associates, Ltd.,* —— U.S. ——, ——, 108 S.Ct. 626, 629, 98 L.Ed.2d

740 (1988) (Court commented, in circumstances involving an undersecured creditor, it is "common ground" that interest of secured party is not adequately protected where security is depreciating). Assuming for the moment that stability in collateral value has relevance where, as here, the collateral value far exceeds the debt, we find that there is such stability here. The Bank argues that the Debtor's accounts receivable are decreasing in value, primarily because the Debtor is devoting its efforts toward earning the right to receive retainages under present receivables rather than creating new receivables. This argument is simplistic. It ignores the fact that the Debtor is operating at least at a break-even level. The Debtor's net worth is therefore not necessarily maintaining a level value; if accounts receivable are declining, that decrease has to be offset by a corresponding increase in assets such as cash or inventory, or a decrease in liabilities. There was no evidence, furthermore, indicating any decrease in liabilities to others to the prejudice of the Bank.

The use of the Bank's cash collateral, moreover, is an element of the Bank's adequate protection. Because the proceeds of accounts receivable are being used in a business which is operating at an approximate break-even point, it follows that the stream of cash collateral will likely remain at an approximate even level over a sustained period, with new proceeds replacing old. The constant nature of this stream gives the Bank protection for its cash collateral.

## III. WEBB'S RIGHT TO INTEREST OR ADEQUATE PROTECTION

Webb requests that the Debtor be required to pay it interest on its debt. It refers to its request as one for adequate protection. But cash payments required for adequate protection are typically geared to a decrease in the value of the collateral rather than interest on the debt. *See* 11 U.S.C. § 361(1). Webb offered no evidence that its collateral value was decreasing. Webb's request for interest appears to be based primarily upon § 506(b), which allows interest to a creditor to the extent that his allowed secured claim is secured by property valued at more than the claim. In any event, Webb claims that the value of its security exceeds its debt; it is therefore necessary to determine Webb's status under § 506(a). Webb's argument that the value of its collateral exceeds its claim rests on two grounds: (1) that the Debtor's assets constituting its collateral are properly valued at going concern values rather than liquidation values; and (2) that the doctrine of marshalling requires the Bank first to obtain payment from the mortgages securing Bosse's personal guaranty before realizing upon its first security interest in the Debtor's assets. We examine each of these grounds separately.

### A. *Valuation*

■ Determination of the appropriate standard for valuation of a secured claim can be quite complex. *See generally* Queenan, *Standards for Valuation of Security Interests in Chapter 11*, 92 Comm. L.J. 18 (1986). The complexity begins with the meaning of the various standards of value. Here the Debtor's witness gave his opinion of the value of the Debtor's assets under two standards, liquidation value and going concern value. We understood the witness to mean by liquidation value an orderly liquidation value consisting of the sum that would likely be obtainable by the Bank if it foreclosed upon and sold its security in a commercially reasonable manner. *See Chrysler Credit Corp. v. George Ruggiere Chrysler–Plymouth, Inc. (In re George Ruggiere Chrysler–Plymouth, Inc.)*, 727 F.2d 1017, 1020 (11th Cir.1984). We understood him to mean by going concern value the sum that would likely be obtained by the Bank from the sale of the Debtor's assets if the business were sold as a going concern.

Webb asserts that going concern value is the proper standard, citing *In re Heatron, Inc.*, 6 B.R. 493 (Bankr.W.D.Mo.1980). That decision, however, merely rejected forced sale values in favor of fair market values. We conclude that an orderly liquidation value is the proper standard of valuation. This is the value that the Bank or

Webb will likely obtain from the collateral in a commercially reasonable foreclosure. There is no prospect for either to obtain going concern value. No sale of the Debtor is in prospect. The fact that the Debtor is a going concern is no reason to value the collateral under the going concern standard unless it appears likely that the secured party will actually receive that value from its collateral through a pending sale. That the Debtor is an operating business with reasonable prospects for continuing is at best a neutral factor; it merely indicates that the collateral will not deteriorate because of lack of maintenance. Legislative history indicates that the reference in § 506(a) to the "proposed disposition or use" of the collateral was intended merely to make it clear that a valuation in one setting would not be binding upon a valuation in another. See S.Rep. No. 989, 95th Cong., 2nd Sess. 90 (1978), U.S.Code Cong. & Admin.News 1978, p. 5787.

### B. *Marshalling*

■ Webb argues that, even if a liquidation value is used, the court should consider Webb's right to require marshalling in valuing its secured claim and that of the Bank. It contends that under Massachusetts law it could require the Bank to pursue Bosse's secured guaranties before the Bank forecloses upon the Debtor's assets. Without such marshalling, Webb is essentially an unsecured creditor because the Bank's first position consumes the Debtor's assets.

Webb cannot require marshalling. Massachusetts requires three elements as prerequisites to marshalling: (1) a common debtor; (2) two separate funds, one of which is a common fund available to both creditors and one of which is available only to the senior creditor; and (3) no detriment or prejudice to the senior creditor if he is required to pursue the fund to which he alone can look. See James Stewart & Co. v. The National Shawmut Bank of Boston, 291 Mass. 534, 556–57, 196 N.E. 169, 180–81 (1935); Broadway National Bank of Chelsea v. Hayward, 285 Mass. 459, 462–63, 189 N.E. 199, 202 (1934). When the first of these elements—a common

debtor—has not been met, Massachusetts courts have been unwilling to stretch the doctrine. See Carter v. Tanners' Leather Co., 196 Mass. 163, 81 N.E. 902 (1907) (court refused to apply marshalling to require a holder in due course of a promissory note to first pursue an indorser of the note rather than the maker).

Webb cites Hayward, supra, for the proposition that the Court can modify the doctrine when: (1) the interests of justice require it; and (2) the fund unavailable to the junior creditor is easily available to the senior creditor and adequate to produce full payment. See Hayward, 285 Mass. at 464, 189 N.E. at 202. It is true that, when applying marshalling principles, a court must be guided by the doctrine's equitable underpinnings. See Cullen v. Revere Copper & Brass, Inc. (In re John I. Paulding, Inc.), 76 B.R. 7, 8 (Bankr.D.Mass.1987). However, Massachusetts courts have required egregious conduct by the senior secured party before they depart from the traditional rules of marshalling. See, e.g., Charles Construction Co. v. Leisure Resources, Inc., 1 Mass.App.Ct. 755, 307 N.E. 2d 336 (1974) (court required marshalling despite lack of two funds when senior creditor purposefully released insurance company from liability to pay full amount of claim, electing instead to look only to limited funds in escrow paid previously by insurance company and subject to junior creditor's attachment). The mere unfairness to junior creditors which results when a senior creditor elects to pursue a primarily liable party as opposed to a secondarily liable party, however, has not been grounds for an exception to the doctrine. See Carter v. Tanners' Leather Co., supra.

Webb also argues that the Eighth Circuit's opinion in Berman v. Green (In re Jack Green's Fashions for Men—Big and Tall, Inc.), 597 F.2d 130 (8th Cir.1979), provides grounds for this Court to require marshalling. We disagree. The court in Jack Green's Fashions was concerned that if a secured creditor was not required to pursue guarantors first, general creditors would receive nothing. That rationale was

soundly rejected by the Supreme Judicial Court of Massachusetts in *Carter v. Tanners' Leather Co., supra.* There, the general creditors of a corporation in receivership sought to require the holder in due course of several promissory notes to marshall assets by pursuing indorsers on the notes first instead of lacking to corporate assets. Although the corporation was the nominal maker of the notes, the notes had been fraudulently issued by the corporation's treasurer. The treasurer and a business associate of the treasurer then indorsed the notes over to the holder, who had no notice of the circumstances of their issuance. The court refused to require marshalling, stating: "The holders of the notes have a right to treat the corporation as their primary debtor and to look in the first instance for their payment to the funds of the corporation ... [the receiver] could not compel them before doing this to bring suit against the indorsers and to exhaust their assets." *Carter,* 196 Mass. at 168, 81 N.E. at 904. Although an element in the court's decision was the prejudice to the holder in having to bring suit first against the indorsers, the principles set out are equally applicable here where no fraud has been alleged.

*Jack Green's Fashions* has been criticized, moreover, for its application of marshalling principles without first applying the traditional requirement of a common debtor. *See, e.g., Dupage Lumber & Home Improvement Center Co. v. Georgia–Pacific Corp.,* 34 B.R. 737, 741 (N.D. Ill.1983); *Federal Land Bank of Columbia v. Tidwell (In re McElwaney),* 40 B.R. 66, 72 n. 10 (Bankr. M.D.Ga.1984). Finally, the facts of *Jack Green's Fashions* are distinguishable from those in this case. There, several general creditors in a liquidation case would have been left with nothing if marshalling were not required. Here, we have a single junior creditor in a reorganization case with an operating debtor.

C. *Value of Webb's Claim as a Secured Claim*

 Because Webb cannot compel marshalling, the value of the Bank's first security interest in the Debtor's assets must be deducted from the value of those assets in order to determine the value of Webb's security interest. Because the Bank's claim exceeds the value of its first security interest, Webb's security interest is valueless. It follows that Webb is entitled to neither interest nor adequate protection.

An appropriate order shall issue.

## FINAL ORDER GRANTING USE OF CASH COLLATERAL

In accordance with the Findings of Fact and Rulings of Law issued this same day on the Debtor's motion for use of cash collateral, it is hereby ORDERED that:

1. T.H.B. Corporation (the "Debtor") is authorized to use cash collateral pursuant to 11 U.S.C. § 363(c); and
2. The claim of F.W. Webb Company is an unsecured claim.